Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MICHAEL HANSON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL HANSON, on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>WISE PUBLISHING AMERICA, INC., a Delaware corporation; WISE PUBLISHING, INC.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

1

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff MICHAEL HANSON ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendants WISE PUBLISHING AMERICA, INC., a Delaware corporation and WISE PUBLISHING, INC. (referred to collectively as "Defendants" or "Wise Publishing"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.moneywise.com (the "Website"), a website that Defendants provide for public access and use.

2.    During his use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendants were causing and permitting Third Parties to intercept the content of his communications and reveal his personal and sensitive page views, including pages communicating his search queries and his interests.

3.    Defendants caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing, the page titles, and the referrer URLs reflecting prior navigation, which were transmitted to the Third Parties during the page-load process itself.

4.    As set forth in the Specific Allegations section of this Complaint below, Defendants surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendants intentionally deploy these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

///

2

5.    Defendants deploy these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendants have done so from prior to the beginning of the class period in this case and continuously through to today and ongoingly.

## II.    GENERAL ALLEGATIONS

6.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7.    When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, search-query parameters, page titles, referrer URLs reflecting prior navigation, session-level identifiers, and browser and device characteristics.

8.    When users visit the Website, Defendants cause tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Comscore Tracker
- The Google Ads / DoubleClick Tracker
- The Quantcast Tracker

9.    The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendants' direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

10.    The Trackers are operated by distinct third parties, including Comscore, Inc., also branded as Scorecardresearch (as to the Comscore audience-measurement tracker), Google LLC (as to the Google Ads / DoubleClick programmatic-advertising

3

tracker), and Quantcast Corporation (as to the Quantcast identity-resolution and audience-measurement tracker) (collectively, the "Third Parties"). Defendants knowingly embed and deploy the Trackers on the Website to facilitate the third parties' interception of the contents of users' electronic communications.

11.    The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization.

12.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendants did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

13.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

### III.    PARTIES

14.    Plaintiff MICHAEL HANSON is a California citizen residing in San Bernardino County, California, and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period including but not limited to on May 2, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

15.    Defendant WISE PUBLISHING AMERICA, INC. is a Delaware corporation that owns, operates, and controls the Website, an online personal-finance

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

publication through which Defendants publish daily personal-finance, investing, retirement, taxation, credit, and consumer-finance content directed to American readers.

16.     Defendant WISE PUBLISHING, INC. is a Canadian corporation incorporated under the laws of the Province of Ontario that owns, operates, and controls the Website, an online personal-finance publication through which Defendants publish daily personal-finance, investing, retirement, taxation, credit, and consumer-finance content directed to American readers.

17.     Through the Website and related digital platforms, Defendants conduct media and publishing business directed at readers nationwide and serve readers in California and throughout the United States.

## IV.     JURISDICTION AND VENUE

18.     This Court has personal jurisdiction over Defendants because Defendants have deliberately and intentionally directed their operation of the Website at California consumers and at the California-based technology infrastructure on which its operation of that website depends. Defendants' contacts with California are neither random, isolated, nor fortuitous.

19.     Defendants deliberately installed and continue to operate Comscore, Inc. tracking infrastructure on the moneywise.com website. Comscore, Inc. is a Delaware corporation with its headquarters in Reston, Virginia, but operates its tracking endpoint sb.scorecardresearch.com from servers and personnel that include California-based operations; Comscore is also a registered California data broker under California Civil Code § 1798.99.80 et seq. Defendants' deliberate installation of Comscore tracking on every page of the moneywise.com website causes outbound HTTP requests bearing California users' URL contents, page titles, and persistent identifiers to flow continuously to Comscore's infrastructure.

20.     Defendants deliberately install and continue to operate Google Ads / DoubleClick tracking infrastructure on the moneywise.com website. Google LLC, the operator of googleads.g.doubleclick.net and www.google.com/pagead/1p-user-list, is a

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

California limited liability company headquartered in Mountain View, California. Defendants' deliberate installation of Google Ads / DoubleClick tracking, including the simultaneous operation of two distinct Google Ads conversion accounts, causes outbound HTTP requests bearing California users' URL contents, page titles, the Google Ads conversion linker identifier auid, the persistent IDE third-party advertising cookie, the NID Google account-linked cookie, and the logged-in Google session cookie to flow continuously to Google's California-based infrastructure.

21.    Defendants deliberately installed and continue to operate Quantcast Corporation tracking infrastructure on the Website. Quantcast Corporation is headquartered in San Francisco, California. Defendants' deliberate installation of Quantcast tracking causes outbound HTTP requests bearing California users' URL contents, the publisher-side first-party Quantcast identifier fpa, the persistent Quantcast mc cookie, and the Google Analytics Client ID _gacid (the identity-bridge by which the California-based Google Analytics user identifier is transmitted to Quantcast's California-based infrastructure in a single outbound HTTP request, all alongside the page URL) to flow continuously to Quantcast's California-based infrastructure.

22.    Defendants' corporate identity includes a name directed at the American (and necessarily Californian) market. Defendants utilize under a corporate name expressly invoking the American market, Wise Publishing America, Inc., and operate the Website on a generic top-level domain (.com) used to reach American readers. The Website serves content primarily relevant to American readers (American personal-finance, American taxation, American retirement and credit topics), and Defendants have caused the Website to be configured to install California-based and California-data-broker-registered third-party tracking infrastructure that operates on California-based servers and processes the data of California users.

23.    Defendants have caused its Website to deposit and maintain persistent first-party identifier cookies on California users' browsers. The deliberate installation of these first-party identifier cookies on California users' browsers, together with their use as

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

identity-mirrors transmitted to California-based third-party tracking infrastructure, constitutes purposeful availment of California by Defendants.

24. Plaintiff's claims arise directly out of and relate to these California-directed contacts. Plaintiff, a California resident, visited the Website from California; during that visit, Defendants' deliberately installed California-directed tracking infrastructure caused Plaintiff's communications with the Website, including his search-query contents, the URLs he visited, and the page titles of those URLs, to be transmitted in real time to the California-based Google Ads infrastructure, the California-based Quantcast infrastructure, and the Comscore infrastructure (Comscore being a registered California data broker), accompanied by persistent user-level identifiers. Plaintiff's injury thus arose directly from Defendants' California-directed acts.

25. Defendants' privacy disclosures identify the categories of information it collects from visitors to its Website and shares with third parties, including IP address, general location, device and browser information, unique identifiers used to track user activity and transactions, information users provide in forms and registrations, and data gathered through cookies and third-party analytics tools such as Google and Adobe Analytics. Defendants further disclose that they share personal information with marketing companies and analytics providers, and that it may sell cookie-derived information in anonymized form. These disclosures, together with Defendants' admitted use of cookies and analytics to learn about users' "preferences and interests" and to optimize the user experience, are consistent with Plaintiff's allegation that the tracking technologies on the Website captured content-level browsing information, including pages viewed and on-site interactions, during Plaintiff's visits to the URLs identified herein, and that such disclosures may constitute a "sale" or "share" of personal information under the California Consumer Privacy Act and the California Privacy Rights Act

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

26.    Exercise of personal jurisdiction in this District over Defendants for these California-arising claims is reasonable and consistent with traditional notions of fair play and substantial justice.

27.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

28.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

29.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and at least one Class Member is a citizen of a State different from Defendant's state of citizenship, satisfying CAFA's minimal-diversity requirement.

30.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendants regularly transact business in this District, operate the Website that serves California residents in this District, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from his San Bernardino County residence; (3) Plaintiff resides in this District; and (4) Defendants derive substantial revenue from California consumers in this District.

## V.    FEDERAL AND STATE PRIVACY LAWS

### 1.    The California Invasion of Privacy Act (CIPA)

31.    The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California

Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

32.    Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

33.    CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein constitute concrete injuries sufficient to establish Article III standing.

34.    Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.    The Federal Wiretap Act**

35.    The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

36.    The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any

9

transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

37.    A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI.    SPECIFIC ALLEGATIONS

38.    Defendants own, operate, and control the moneywise.com website, an online personal-finance publication through which Defendants publish daily personal-finance content, including content on investing, retirement, taxation, credit, household budgeting, real estate, and consumer-finance topics directed to American readers. The Website includes an on-site search feature whose query terms are encoded directly in the search-results URL (e.g., /search/results?query=<term>), with the result that a visitor's search-query input becomes part of the URL of the page the visitor is reading.

39.    During his use of the Website, Plaintiff navigated to the following URLs, unaware that Defendants were causing and permitting Third Parties to intercept the content of his communications:

- https://moneywise.com/search/results?query=transgender;
- https://moneywise.com/search/results?query=LGTBQ; and
- https://moneywise.com/managing-money/budgeting/nsync-joey-fatone-bankruptcy-finances-rebuild (12:32:40 PM PDT).

40.    Plaintiff alleges on information and belief that the tracking mechanisms described below operated on the Website during Plaintiff's visits to the URLs identified

above and intercepted the substantive contents of his communications with the Website. The figures that appear in the per-tracker subsections below depict the tracking behavior that the Website is configured to produce when any user visits the URLs at issue, and evidence that Defendants' deliberately installed tracking infrastructure intercepted the contents of Plaintiff's communications with the Website during Plaintiff's session.

41.     Beyond the URLs, each Tracker receives, during each of those page loads, the page URLs identifying the content Plaintiff was viewing transmitted as named payload parameters, the page titles transmitted as named payload parameters, and the source-page URL transmitted in the Referer header or, where applicable, in the ref= URL parameter. Each of those fields communicates the substance, purport, or meaning of what Plaintiff was reading or searching for on the Website, and is therefore content of Plaintiff's electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8).  Each Tracker section below illustrates what occurs during live browser access to those pages.

*1.     The Comscore Tracker*

42.     Defendants embedded and deployed a Comscore audience-measurement tracker on the Website, operated by Comscore, Inc. through its Scorecardresearch platform. Comscore is a registered California data broker. The Comscore tracker fires automatically when a user visits the Website, transmitting Defendants' registered Comscore Publisher/Site ID, the page URL, and the page title to Comscore's data collection servers at sb.scorecardresearch.com, and simultaneously links the request to persistent third-party UID and XID cookies stored on the visitor's browser on .scorecardresearch.com. Comscore, Inc. operates one of the largest audience-measurement and digital-analytics platforms in the world, using intercepted browsing data for cross-publisher audience measurement, behavioral profiling, and targeted advertising.

43.     Plaintiff            visited            the            Website            at https://moneywise.com/search/results?query=transgender, a search-results URL that, on

11

its face, communicates the substance of Plaintiff's search query to anyone who reads the URL. When Plaintiff navigated to that URL, the Website caused Plaintiff's browser to transmit a Comscore tracking request to sb.scorecardresearch.com that carried the page URL, the page title, and the source-page URL contemporaneously with persistent third-party cookies on .scorecardresearch.com. The page URL and the persistent identifier appeared in the same outbound request.

44.    Figure 1 is a Fiddler Classic raw request capture showing a GET request transmitted from the user's browser to Comscore's data collection servers at sb.scorecardresearch.com. The request contains Moneywise's registered Comscore property identifier, the full URL of the page the user was browsing, and a persistent Comscore user identifier transmitted in the request Cookie header, establishing that the page URL containing the user's search query and the page metadata were transmitted to Comscore in the same outbound request as the persistent user identifier.

## **Figure 1**

45.    Plaintiff also visited the Website at https://moneywise.com/search/results?query=LGTBQ, a second search-results URL that, on its face, communicates the substance of Plaintiff's search query to anyone who

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

reads the URL. When Plaintiff navigated to that URL, the Website again caused Plaintiff's browser to transmit a Comscore tracking request to sb.scorecardresearch.com that carried the page URL, the page title, and the source-page URL in the Referer header, with the same persistent third-party Comscore cookies on .scorecardresearch.com.

46.    Figure 2 is a Fiddler Classic raw request capture showing a GET request transmitted from the user's browser to Comscore's data collection servers at sb.scorecardresearch.com. The request contains the same Comscore property identifier shown in Figure 1, the full URL of the page the user was browsing, the page title "Search | Moneywise" in the c8 parameter, the Referer https://moneywise.com/, and a persistent Comscore user identifier transmitted in the request Cookie header, establishing that the page URL containing the user's search query for LGTBQ content and the page metadata were transmitted to Comscore in the same outbound request as the persistent user identifier.

<u>**Figure 2**</u>

47.    Plaintiff also visited the Website at https://moneywise.com/managing-money/budgeting/nsync-joey-fatone-bankruptcy-finances-rebuild,  a  personal-finance article URL whose URL path and title expressly disclose the article's subject matter as

concerning bankruptcy and financial distress. When Plaintiff navigated to that URL, the Website caused Plaintiff's browser to transmit a Comscore tracking request to sb.scorecardresearch.com that carried the full article URL, the article title in the c8 parameter, and the source-page URL in the Referer header, with the same persistent Comscore cookies.

48.     Figure 3 is a Fiddler Classic raw request capture showing a GET request transmitted from the user's browser to Comscore's data collection servers at sb.scorecardresearch.com. The request contains the same Moneywise Comscore property identifier shown in Figures 1 and 2, the full URL of the article the user was browsing, the article title, and a persistent Comscore user identifier transmitted in the request Cookie header, establishing that the article URL identifying the user's interest in bankruptcy and personal-financial-distress content, and the article title containing the same subject matter, were transmitted to Comscore in the same outbound request as the persistent user identifier.

**Figure 3**



49.     Comscore's servers at sb.scorecardresearch.com returned HTTP 204 No Content responses to each of the tracking requests, confirming that Comscore received

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

50.    Comscore, Inc. used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity, for cross-publisher audience measurement, behavioral profiling, and the construction of audience segments that are made available to advertisers and ad-technology partners through Comscore's commercial products. The persistent UID and XID cookies set on .scorecardresearch.com, with approximately 390-day expirations, enable Comscore to link Plaintiff's communications with the Website to a continuing user profile across sessions and across publishers. This commercial use of intercepted content is precisely what the Comscore tracker is designed and marketed to accomplish.

51.    Comscore, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendants aided and abetted Comscore's interception by embedding and configuring the Comscore tracker on the Website. By causing Comscore to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### 2.    The Google Ads / DoubleClick Tracker

52.    Defendants embedded and deployed a Google Ads / DoubleClick programmatic-advertising tracker on the Website, operated by Google LLC through its Google Ads, DoubleClick, and remarketing/conversion infrastructure. Google LLC is a California limited liability company headquartered in Mountain View, California, and operates the endpoints googleads.g.doubleclick.net and www.google.com/pagead/1p-user-list (among others) from California-based servers. The Google Ads / DoubleClick tracker fires automatically when a user visits the Website, transmitting the page URL (in the url parameter), the referrer URL (in the ref parameter), the page title (in the tiba parameter), screen dimensions and device fingerprinting data, and a Google Ads

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

conversion linker identifier (the auid URL parameter, which mirrors the first-party _gcl_au cookie Defendants have caused to be stored on the visitor's browser on the .moneywise.com domain).

53. Defendants operate two distinct Google Ads conversion accounts, causing the same browsing data to be transmitted in parallel to both accounts on every page load. Google LLC simultaneously links each request to persistent third-party identifiers stored on the visitor's browser, including the IDE cookie on .doubleclick.net, the NID cookie on .google.com, and (where the visitor is signed into a Google account) the __Secure-3PSID logged-in Google session cookie on .google.com. Google LLC operates one of the largest digital-advertising and identity-resolution platforms in the world, using intercepted browsing data to build behavioral profiles, power real-time bidding auctions, and enable interest-based advertising campaigns across the Google Ads programmatic ecosystem.

54. When Plaintiff navigated to https://moneywise.com/search/results?query=transgender, the Website caused Plaintiff's browser to transmit a Google Ads / DoubleClick tracking request to googleads.g.doubleclick.net that carried the page URL of the search-results page in the url parameter, the referrer URL in the ref parameter, the page title in the tiba parameter, device-fingerprinting parameters, and the Google Ads conversion linker identifier (auid) mirroring the first-party _gcl_au cookie. The page URL and the persistent identifier appeared in the same outbound request.

55. Figure 4 is a Fiddler Classic raw request capture showing a GET request transmitted from the user's browser to Google's advertising servers at googleads.g.doubleclick.net. The request contains the full URL of the page the user was browsing (https://www.moneywise.com/search/results?query=transgender) in the url parameter, the same URL in the ref (referrer) parameter, the page title, the user's screen dimensions, and a Google Ads conversion linker identifier that mirrors the first-party _gcl_au cookie Moneywise had caused to be stored on the user's browser under the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

.moneywise.com domain, establishing that the page URL containing the user's search query for transgender content, the page title, and the device fingerprinting data were transmitted to Google in the same outbound request as the identifier linking the user's browser to Moneywise's first-party tracking.

**Figure 4**



56.     When Plaintiff navigated to https://moneywise.com/search/results?query=LGTBQ, the Website again caused Plaintiff's browser to transmit a Google Ads / DoubleClick tracking request to googleads.g.doubleclick.net that carried the page URL in the url parameter, the referrer URL in the ref parameter, the page title in the tiba parameter, and the Google Ads conversion linker identifier mirroring the first-party _gcl_au cookie.

57.     Figure 5 is a Fiddler Classic raw request capture showing a GET request transmitted from the user's browser to Google's advertising servers at googleads.g.doubleclick.net. The request contains the full URL of the page the user was browsing (https://www.moneywise.com/search/results?query=LGTBQ) in the url parameter, the same URL in the ref (referrer) parameter, the page title, and a Google Ads conversion linker identifier that mirrors the first-party _gcl_au cookie Moneywise had

caused to be stored on the user's browser under the .moneywise.com domain, establishing that the page URL containing the user's search query for LGTBQ content and the page title were transmitted to Google in the same outbound request as the identifier linking the user's browser to Moneywise's first-party tracking.

**Figure 5**



58.    Additionally, when Plaintiff navigated to the bankruptcy article URL https://moneywise.com/managing-money/budgeting/nsync-joey-fatone-bankruptcy-finances-rebuild, Defendants transmitted the article URL and the article title "How Joey Fatone avoided bankruptcy after his NSYNC days" to googleads.g.doubleclick.net together with persistent DoubleClick identifiers (the IDE third-party advertising cookie on .doubleclick.net, the auid URL-parameter linker mirroring the first-party _gcl_au cookie on .moneywise.com, the NID Google account-linked cookie on .google.com, and the __Secure-3PSID logged-in Google session cookie on .google.com) across eight separate HTTP requests spanning two distinct Google Ads conversion accounts. The bankruptcy article URL and the bankruptcy article title appeared in the same outbound requests as the persistent Google identifiers.

/ / /

18

59.     Google's servers at googleads.g.doubleclick.net returned HTTP 200 OK responses to the tracking requests, confirming that Google LLC received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

60.     Google LLC used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity (Plaintiff's search queries on sexual-orientation and gender-identity topics and his interest in a personal-finance article concerning bankruptcy), to build behavioral profiles, power real-time bidding auctions, and enable interest-based advertising campaigns across the Google Ads programmatic-advertising ecosystem. The persistent IDE cookie set on .doubleclick.net (approximately 390-day expiration on information and belief), the NID cookie set on .google.com (approximately 180-day expiration on information and belief), the __Secure-3PSID logged-in Google session cookie on .google.com (approximately 365-day expiration as confirmed by the Set-Cookie response observed during the capture window), and the first-party _gcl_au cookie set on .moneywise.com (mirrored to DoubleClick as the auid URL parameter), enable Google LLC to link Plaintiff's communications with the Website to a continuing user profile across sessions, devices, and websites, including to Plaintiff's signed-in Google identity. This commercial use of intercepted content is precisely what the Google Ads / DoubleClick programmatic-advertising tracker is designed and marketed to accomplish.

61.     Google LLC is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendants aided and abetted Google's interception by embedding and configuring the Google Ads / DoubleClick tracker on the Website, including by causing the first-party _gcl_au conversion linker cookie to be stored on Defendants' own .moneywise.com domain and mirrored to DoubleClick as the auid URL parameter, and by operating two parallel Google Ads conversion accounts. By causing Google LLC to intercept the contents of Plaintiff's electronic communications

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

with the Website in this manner, Defendants violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### 3.    The Quantcast Tracker

62.    Defendants embedded and deployed a Quantcast identity-resolution and audience-measurement tracker on the Website, operated by Quantcast Corporation through its pixel.quantserve.com infrastructure. The Quantcast tracker fires automatically when a user visits the Website, transmitting the page URL (in the url parameter), the referrer URL (in the ref parameter on subsequent navigations), and an identity-bridge basket of identifiers including the persistent third-party mc cookie on .quantserve.com, the first-party _qca cookie on .moneywise.com mirrored to Quantcast as the fpa= URL parameter, and the Google Analytics Client ID value mirrored from the first-party _ga cookie on .moneywise.com to Quantcast as the _gacid URL parameter. Quantcast Corporation operates a cross-publisher identity-resolution and audience-measurement platform, using intercepted browsing data to build addressable audience segments, perform identity resolution across publishers, and enable interest-based advertising.

63.    When Plaintiff navigated to https://moneywise.com/search/results?query=transgender, the Website caused Plaintiff's browser to transmit a Quantcast tracking request to pixel.quantserve.com that carried the page URL in the url parameter, the first-party _qca-mirror value in the fpa parameter, the _ga-mirror value in the _gacid parameter, and the persistent third-party mc cookie. The page URL and the persistent identifiers appeared in the same outbound request.

64.    Figure 6 is a Fiddler Classic raw request capture showing a request transmitted from the user's browser to Quantcast's data collection servers at pixel.quantserve.com. The request contains the full URL of the page the user was browsing, a first-party identifier mirror (fpa=) carrying the value of the _qca first-party cookie Moneywise had caused to be stored on the user's browser under the

20

.moneywise.com domain, a Google Analytics Client ID mirror (_gacid=) carrying the value of the _ga first-party cookie also stored under the .moneywise.com domain, and a persistent Quantcast user identifier (mc cookie) transmitted in the request Cookie header, establishing that the page URL containing the user's search query for transgender content was transmitted to Quantcast in the same outbound request as three persistent user identifiers: the publisher-side first-party Quantcast identifier mirror, the Google Analytics user identifier, and Quantcast's own third-party persistent identifier.

**Figure 6**



65.     When Plaintiff navigated to https://moneywise.com/search/results?query=LGTBQ, the Website again caused Plaintiff's browser to transmit a Quantcast tracking request to pixel.quantserve.com that carried the page URL in the url parameter, the referrer URL in the ref parameter, the first-party _qca-mirror value in the fpa parameter, the _ga-mirror value in the _gacid parameter, and the persistent third-party mc cookie.

66.     Figure 7 is a Fiddler Classic raw request capture showing a GET request transmitted from the user's browser to Quantcast's data collection servers at pixel.quantserve.com. The request contains the full URL of the page the user was

21

browsing in the url parameter, the same URL in the ref (referrer) parameter, a first-party identifier mirror (fpa=) carrying the value of the _qca first-party cookie Moneywise had caused to be stored on the user's browser under the .moneywise.com domain, and a Google Analytics Client ID mirror (_gacid=) carrying the value of the _ga first-party cookie also stored under the .moneywise.com domain, establishing that the page URL containing the user's search query for LGTBQ content was transmitted to Quantcast in the same outbound request as the publisher-side first-party identifier mirror and the Google Analytics user identifier.

## Figure 7



67. Additionally, the bankruptcy article URL https://moneywise.com/managing-money/budgeting/nsync-joey-fatone-bankruptcy-finances-rebuild was transmitted to Quantcast (pixel.quantserve.com) in an HTTP request that carried the mc Quantcast persistent identifier, the fpa=_qca first-party identifier mirror, and the _gacid Google Analytics Client ID mirror (the same identity-bridge basket documented in Figures 6 and 7). The bankruptcy article URL appeared in the same outbound request as those persistent identifiers.

/ / /

22

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

68.   Quantcast's servers at pixel.quantserve.com returned HTTP 200 OK responses to the tracking requests, confirming that Quantcast received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

69.   Quantcast Corporation used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity (Plaintiff's search queries on sexual-orientation and gender-identity topics and his interest in a personal-finance article concerning bankruptcy), to perform cross-publisher identity resolution, build addressable audience segments, and enable interest-based advertising across Quantcast's programmatic ecosystem. The persistent mc cookie on .quantserve.com (approximately 396-day expiration), the first-party _qca cookie stored on Defendants' own .moneywise.com domain (multi-year expiration, mirrored to Quantcast as the fpa URL parameter), and the identity-bridge transmission of the _ga Google Analytics Client ID to Quantcast as the _gacid URL parameter, enable Quantcast to link Plaintiff's communications with the Website to a continuing user profile across sessions, publishers, and analytics platforms while bypassing third-party cookie restrictions imposed by modern browsers. This commercial use of intercepted content is precisely what the Quantcast tracker is designed and marketed to accomplish.

70.   Quantcast Corporation is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendants aided and abetted Quantcast's interception by embedding and configuring the Quantcast tracker on the Website, including by causing the first-party _qca cookie to be stored on Defendants' own .moneywise.com domain and mirrored to Quantcast as the fpa URL parameter, and by causing the Google Analytics _ga client identifier value to be mirrored to Quantcast as the _gacid URL parameter. By causing Quantcast to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

23

**4.      *Persistent Identifier Storage Across the Trackers***

71.      The Trackers' persistent identifier mechanisms are stored on the visitor's browser as cookies, including both third-party cookies on each Tracker's own domain and first-party cookies on Defendants' .moneywise.com domain that mirror tracker identifiers. Figures 8 and 9 are Chrome DevTools Application → Cookies panel captures showing the browser's cookie storage during the capture windows for URL 1 and URL 2.

72.      Figure 8 is a Chrome DevTools Application → Cookies panel scoped to https://moneywise.com, showing the persistent identifier cookies stored on the user's browser at the moment of capture. The panel shows the Comscore UID and XID third-party cookies on the .scorecardresearch.com domain with multi-year expirations, the Quantcast mc third-party cookie on the .quantserve.com domain with a multi-year expiration, the Quantcast _qca first-party cookie on the .moneywise.com domain (the publisher-side first-party identifier mirror), the Google Analytics _ga first-party cookie on the .moneywise.com domain (the Google Analytics user identifier mirror), the Google Ads _gcl_au first-party cookie on the .moneywise.com domain (the conversion linker mirror), the Google NID and test_cookie third-party cookies on the .google.com and .doubleclick.net domains, and the usprivacy first-party cookie on the .moneywise.com domain with the value 1NNN confirming that no third-party opt-out signal is applied, establishing that the third-party trackers identified in the preceding figures maintain persistent identifiers on the user's browser and that Moneywise has caused first-party mirrors of those identifiers to be deposited and maintained on its own domain.

/ / /

/ / /

24

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 8**



73.     Figure 9 is a second Chrome DevTools Application Cookies panel scoped to https://moneywise.com, showing the same roster of persistent identifier cookies depicted in Figure 8 with refreshed identifier values for the second capture window, establishing the continuity of the persistent identifier infrastructure across the user's session.

**Figure 9**



25

74.     Together, Figures 8 and 9 confirm that each of the three Trackers maintains a persistent identifier mechanism on the visitor's browser that survives across multiple page loads in a single session, enabling each Tracker to link Plaintiff's communications with the Website to a continuing user profile across sessions, devices, and contexts. The first-party identifier cookies set on Defendants' own .moneywise.com domain confirm that Defendants have deliberately configured the Website to install persistent identifier infrastructure on California users' browsers and to mirror that infrastructure to the third-party tracker endpoints in the form of the fpa, _gacid, and auid URL parameters.

### 5.     Real-Time Tracker Activation During Page Load

75.     The Trackers fire automatically during the Website's page-load process, contemporaneously with (and while) Plaintiff's communications with the Website are in transit. Figures 10, 11, and 12 are network waterfall captures showing the page-load timing for each of the three URLs at issue. Each waterfall demonstrates that the Trackers' outbound requests fire during the same time window in which the Website delivers the requested page contents to the user's browser, and before the page-load process has completed. No user interaction is required to trigger the Tracker requests, which fire automatically as part of the page-load process.

76.     Figure 10 is a WebPageTest network waterfall visualization showing the network requests issued by the user's browser during the load of the moneywise.com transgender search-results page. The visualization is a vertically stacked timeline of individual HTTP requests issued during the page load. Visible request bars include the first-party page load itself, multiple sequential Comscore requests to sb.scorecardresearch.com (the beacon script and the tracking pixel requests), multiple sequential Quantcast requests to pixel.quantserve.com, and multiple sequential Google Ads / DoubleClick requests to googleads.g.doubleclick.net and to www.google.com (the conversion measurement, remarketing collect, and 1p-user-list endpoints), establishing that the third-party tracking requests fired automatically, concurrently with the first-party page load, with no user interaction required to trigger the transmission of the user's

communications with the Website.

**Figure 10**



77.    Figure 11 is a WebPageTest network waterfall visualization showing the network requests issued by the user's browser during the load of the moneywise.com LGTBQ search-results page. The visualization shows the same pattern of concurrent tracker firing depicted in Figure 10: the first-party page load itself, multiple sequential Comscore beacon and tracking requests to sb.scorecardresearch.com, multiple sequential Quantcast requests to pixel.quantserve.com, and multiple sequential Google Ads / DoubleClick requests to googleads.g.doubleclick.net and to www.google.com, establishing that the same third-party tracking infrastructure fired automatically and concurrently with the first-party page load of the second sensitive search URL, with no user interaction required.

**Figure 11**



/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

78.     Figure 12 is a WebPageTest network waterfall visualization showing the network requests issued by the user's browser during the load of the moneywise.com bankruptcy article URL. The visualization shows the first-party article page load itself and multiple sequential Comscore beacon and tracking requests to sb.scorecardresearch.com firing concurrently with the first-party content delivery, establishing that the same Comscore tracking infrastructure that fired on the search-results pages also fired automatically on the bankruptcy article URL, with no user interaction required to trigger the transmission of the user's communications with the Website.

**Figure 12**



79.     Together, Figures 10, 11, and 12 confirm that the Trackers' interception of Plaintiff's communications with the Website occurs in real time, while those communications are in transit between Plaintiff's browser and the Website's servers, and before the page-load process has completed.

## VII.   CLASS ALLEGATIONS

80.     Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more Trackers between May 2, 2025 and the present.

/ / /

28

81.    **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendants.

82.    **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendants configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendants' conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendants' conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendants' conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Defendants' conduct violates the California Constitution;
- Whether Defendants' conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

83.    **TYPICALITY:** As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

/ / /

29

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

84.   **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

85.   **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII.  FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

By Plaintiff and the Class Members Against All Defendants

86.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

87.   Plaintiff brings this cause of action on behalf of himself and the Class.

88.   California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained.

89.   The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers received human-readable copies of URL strings in the same HTTP request or response in which the Website servers received them, while that communication was in transit between Plaintiff's browser and the Website.

/ / /

30

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

90.    Defendants intentionally configured their website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

91.    Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX.    SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

By Plaintiff and the Class Members Against All Defendants

92.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

93.    Plaintiff brings this cause of action on behalf of himself and the Class.

94.    18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

95.    The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' browsing. As described in the preceding tracker-specific allegations, the Trackers intercepted URL contents in real time, in the same HTTP request or response in which the Website's servers received them, while those communications were in transit.

31

96.     Defendants intentionally configured their website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

97.     Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendants through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X.     THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

#### By Plaintiff and the Class Members Against All Defendants

98.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

99.     Plaintiff brings this cause of action on behalf of himself and the Class.

100.     California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendants' conduct constitutes both an unlawful and an unfair business practice.

101.     Defendants' conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendants violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

102.     Defendants' conduct is also unfair. Defendants covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

and the Class, including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof, is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

103. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendants' conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendants used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

104. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendants and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

105. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendants from continuing its unlawful and unfair practices, restitution of monies acquired by Defendants through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

///

///

33

## XI.   FOURTH CAUSE OF ACTION

**Violation of the California Constitution, Article I, Section 1**

By Plaintiff and the Class Members Against All Defendants

106.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

107.   Plaintiff brings this cause of action on behalf of himself and the Class.

108.   Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

109.   Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

110.   Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a personal-finance digital publication like moneywise.com does not expect that the specific pages they browse, the specific search terms they submit, and the specific articles they read on personal-finance topics will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

111.   Defendants' conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring three third-party tracking technologies on the Website, Defendants caused the real-time, covert interception of the URL contents of

Plaintiff's and Class Members' electronic communications and their transmission to third parties where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the Website, the sensitivity of the content browsed (sexual-orientation and gender-identity search queries and bankruptcy-related personal-finance content), the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

112.   As a result of Defendants' invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII.   FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

By Plaintiff and the Class Members Against All Defendants

113.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

114.   Plaintiff brings this cause of action on behalf of himself and the Class.

115.   The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

116.   Defendants intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding three third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to third parties without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

35

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

117. The intrusion is highly offensive to a reasonable person. Defendants covertly deployed tracking technologies that captured the specific content Plaintiff was browsing (including Plaintiff's search queries on sexual-orientation and gender-identity topics and his interest in a personal-finance article concerning bankruptcy) and transmitted it to multiple third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the nature of the Website and the sensitivity of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent cross-session identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

118. As a result of Defendants' intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII. SIXTH CAUSE OF ACTION

### Unjust Enrichment

By Plaintiff and the Class Members Against All Defendants

119. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

120. Plaintiff brings this cause of action on behalf of himself and the Class.

121. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

122. Defendants received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website,

Defendants received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendants' arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

123. Defendants received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendants and their tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

124. It is inequitable for Defendants to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendants' concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

125. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendants were unjustly enriched at Plaintiff's and Class Members' expense.

## XIV. **PRAYER FOR RELIEF**

126. WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendants' conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

3. An order enjoining Defendants from continuing the conduct alleged herein;

4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendants through the violation, or $100 per day per violation or $10,000, whichever is greater;

6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9. Compensatory and nominal damages for intrusion upon seclusion;

10. Restitution and disgorgement of all amounts by which Defendants were unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

127. Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   May 20, 2026        **LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

38

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED